IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:13-CV-684-F

| | | |
|---|---|---|
| ANTHONY E. WHITE, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| CATERPILLAR LOGISTICS, INC., | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on the Motion for Summary Judgment [DE-57] filed by Defendant Caterpillar Logistics, Inc. ("CLI"). *Pro se* Plaintiff Anthony E. White has responded, and CLI has replied. For the reasons stated below, the motion for summary judgment is ALLOWED.

## I. PROCEDURAL HISTORY

White initiated this action by filing motion for leave to proceed in forma pauperis [DE-1] which was allowed on October 7, 2013 [DE-3]. In the Complaint [DE-4], White alleges the unlawful termination of his employment, the failure to promote him, retaliation, and harassment, all based on his race and in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.* The court later allowed White to amend his complaint [DE-13], although the substance of his claims did not change markedly.

After a series of pretrial motions filed by both parties, CLI filed its Motion for Summary Judgment [DE-57] on September 2, 2014. After receiving an extension of time [DE-62], White filed his response [DE-63; DE-64] on October 9, 2014. CLI filed its Reply [DE-65] on October 23, 2014.

## II. FACTS

The facts, stated in the light most favorable to White, are as follows.

### A.     The parties

Caterpillar, Inc. ("Caterpillar") is a Delaware corporation and a manufacturer of construction and mining equipment, diesel and natural gas engines, and industrial gas turbines. Decl. of Terrill Merritt [DE-58-2] ¶ 3. CLI is a wholly-owned subsidiary of Capterillar, and has a facility located inside Caterpillar's Clayton, North Carolina assembly plant. *Id.* ¶ 4. The Clayton CLI facility is responsible for the receipt, storage, and distribution of Caterpillar parts to Caterpillar's Clayton assembly plant and several other manufacturing facilities nearby. *Id.* ¶ 6.

White was hired by CLI on August 27, 2012, as a full-time Warehouse Associate Team Lead, and more specifically, a Grief Analyst, at the Clayton facility. *Id.* ¶ 13; Dep. of White [DE-58-1] at 19.[1] In this position, White was primarily responsible for dealing with and solving discrepancies in CLI's parts inventory, including tracing missing or misrouted parts and identifying the causes of parts overages or shortages. Dec. of Terrill Merritt [DE-58-2] ¶ 14; Dep. of White [DE-58-1] at 19-20.

---

[1] In his opposition to CLI's Motion for Summary Judgment, White objected to CLI's use of his deposition transcript because he "later amended the transcript for countless errors." Pl.'s Mem. in Opp. to Mot. for Summ. J. [DE-64] at 9. Presumably relying on Federal Rule of Civil Procedure 30(e),White correctly observes that a deponent is allowed "(A) to review the transcript; and (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them." Fed. R. Civ. P. 30(e)(1)(A)-(B). This court, however, agrees with the other courts that have concluded that the rule "does not permit a party to make changes that substantively contradict or modify sworn deposition" testimony. *William L. Thorp Revocable Trust v. Ameritas Inv. Corp.*, ___ F. Supp. 3d ___, No. 4:11-CV-193-D, 2014 WL 4923597, at *4 (E.D.N.C. Sept. 30, 2014). Accordingly, to the extent that White's corrections [DE-64-11] contradict or materially alter his sworn deposition testimony, the court has not considered them.

White worked on the second shift during his employment at CLI. Dep. of White [DE-58-1] at 25-26. When he began working at the Clayton CLI facility, the second shift had one Supervisor, one Team Lead, and a Grief Analyst. *Id.* at 26. White reported to the Supervisor, Chris Richardson. *Id.* The Team Lead when White began his employment was Kirk Gardinier, who also reported to Richardson. *Id.*

In or around January 2013, Bryan Keen replaced Chris Richardson in the Supervisor position, and Brett Ryan became a second Team Lead on the shift. *Id.* at 27. The Team Leads directed the work of hourly warehouse workers, but did not directly oversee White. *Id.* at 28. After Keen became the second shift Supervisor, White reported directly to Keen and indirectly to Keen's superior and CLI's Clayton Facility Manager, Mansur Kadavanthode. *Id.* at 28; Decl. of Terrill Merritt [DE-58-2] ¶ 15.

**B.      White's employment at CLI**

CLI asserts that after about seven months of employment, White was still failing to follow standard operating procedures and to perform adequate investigations into inventory discrepancies. Decl. of Terrill Merritt [DE-58-2] ¶ 17. According to CLI, the effect of these errors was that parts were reported as having already been sent to the line or as having gone missing when they were still on the receiving dock or simply in the wrong location in the warehouse. *Id.* ¶ 18. This, in turn, caused the logistics operation to hold up Caterpillar's assembly process or to needlessly expedite replacement parts from other facilities at great cost. *Id.* ¶ 19.

CLI asserts that it has a policy that when an employee fails to meet performance expectations, he may be placed on an Employment Improvement Plan, or EIP, which outlines the specific performance failure and identifies the behavior that is expected to result in acceptable performance.

3

*Id.* ¶ 20. According to CLI, it is a coaching tool, and CLI does not consider it to be a disciplinary or other adverse action to the employee, but rather, a training mechanism to assist the employee with improving performance. *Id.* ¶ 21.

In accordance with this policy, White was placed on an EIP on April 11, 2012. *Id.* ¶ 22; Dep. of White [DE-58-1], Ex. 9. White had a meeting with his Supervisor, Keen, to discuss the issues outlined in the EIP and means for improvement. Decl. of Terrill Merrit [DE-58-2] ¶ 23; Dep. of White [DE-58-1] at 109. The EIP states that White's performance is unsatisfactory, and lists the following areas where Keen wanted White to improve:

> 1. [White] constantly makes incorrect system moves which ends up having to be corrected by other people later. [White's] BAP (gate in) access has been taken away because of his constant improper use of the function.
> 2. [White] has extreme lack of know[ledge] of the system considering how long he's been in the position and dispite [sic] constant training, retraining and coaching. He has to be constantly coached and retrained by his Team Leads and others on proper system moves.
> 3. [White] displays a lack of focus on the job. His mind is on things other than his job. Some examples of this are: spending a lot of time texting on his phone and performing job searches during production hours.
> 4. [White] doesn't to [sic] retain knowledge of the training and coaching that he receives. He forgets things that he's been shown multiple times.
> 5. [White] does not spend enough time or effort investigating grief issues. . . . .
> 6. [White] rarely seeks assiatance [sic] from his counterpart or the audit team when he can't locate parts . . . .

Dep. of White [DE-58-1], Ex. 9. The EIP also lists specific actions to be taken by White, over the 90-day period of the improvement plan, which included sending out a daily grief report to all section managers, not using his phone on the floor and during production hours, and using his own time to conduct job searches. *Id.* The EIP specifically states: "Sustained improvements must be achieved. If not, the employee will be reassigned, demoted, or discharged." *Id.*

4

The EIP also lists Keen's assessment of White's progress following the EIP meeting.  It lists

Keen's April 18, 2013, notes as White "has made great improvements from where he was so far,"

and on April 29, 2013, Keen notes that White "is maintaining his progress." *Id.* On May 9, 2013,

however, Keen notes that he "found [White] out of his work area and on his phone at 2am. He was

in Mansur's office reading something on this phone." *Id.* According to CLI, this not only violated

its rule against leaving the floor during the working hours and the rule against using a cell phone

during working hours, it also raised concerns about the security of confidential information that

might be in the Facility Manager's office. Decl. of Terrill Merit [DE-58-2] ¶ 25. CLI subsequently

issued White a disciplinary suspension for this incident. *Id.* ¶ 26.

Keen's May 22, 2013, notes reflects a number of errors he felt White had made over the

previous two weeks, including incorrectly tagging parts, incorrectly sending parts to grief (i.e.,

declaring them to be lost) before doing a proper investigation, and failing to send out a grief report.

*Id.* Keen's June 23, 2013 notes document more similar errors over the time period of June 6, 2013

through June 17, 2013. *Id.* The July 11, 2013, notes reflect similar errors by White, as well as a

failure to reorder additional parts.

According to CLI, at the conclusion of the 90-day period, Keen and Kadavanthode

determinted that white was not a good fit for the position.  Instead of terminating him from

employment, however, Keen and Kadavanthode made the decision, with input from Human

Resources Manager Terrill Merritt, to demote White to a Warehouse Associate effective July 11,

2013.  Decl. of Terrill Merritt [DE-58-2] ¶¶ 27-28. The "Final Review" section in the EIP states:

> Upon completion of [White's] 90 day Employee Improvement Plan, it has been
> determined that [White] is not a good fit for this job description. [White] made great
> improvements in the beginning, but failed to sustain and build on those
> improvements. Based on the evidence and documentation provided it has been

5

concluded that [White] either lacks the ability or is unwilling to follow the process and procedures of the job role. As a result, [White] will be removed from his current job role as Warehouse Associate Team Lead, 2nd shift Grief Analyst and demoted to Warehouse Associate effective July 11th, 2013.

Dep. of White [DE-58-1], Ex. 9.

Keen and Merritt met with White on July 11, 2013, to inform him of the decision to demote him to a Warehouse Associate position effective that date. *Id.* at 124; Decl. of Terrill Merritt [DE-58-2] ¶ 29. During the meeting, Keen reviewed the EIP and weekly progress reviews with White, and then explained that White would be demoted to a Warehouse Associate position because the EIP goals were not met. Decl. of Terrill Merritt [DE-58-2] ¶¶ 29-30. White became upset during the meeting and used profanity, at which time Merritt broke off the meeting. *Id.* ¶¶ 29-30; Dep. of White [DE-58-1] at 124. Merritt instructed White to leave for the day, and took his badge. Dep. of White [DE-58-1] at 127. Merritt contends that he suspended White pending a determination as to appropriate further action. Dec. of Terrill Merritt [DE-58-2] ¶ 32. Ultimately, Merritt, Keen and Kadavanthode made the decision to terminate White's employment because of his behavior during the demotion meeting, and Merritt and Keen met with White on July 17, 2013, to communicate that decision. *Id.* ¶ 33.

**C.    White's complaints at CLI**

When White was discovered in the office of the Facility Manager using his smartphone and reprimanded, he allegedly told Keen "y'all are racists around here." Pl.'s Opp., Ex. H [DE-64-8].

Additionally, White sent an email to Merritt on May 14, 2013, regarding concerns he had with Keen and two co-workers, Team Leads Brett Ryan and Kirk Gardinier. *Id.* ¶ 34; Dep. of White [DE-58-1], Ex. 3. In the email, White indicated that notes that Keen had recorded about an injury White had sustained were inaccurate. *Id.* Additionally, at the conclusion of the email, White wrote:

6

I feel Mr. Ryan is assaulting my character by false pretense and tried to intimidate me when asking for assistance by trying to belittle me with his comments which I have mentioned to Brian Keen before. Mr. Ryan has a record for intimidating people and causing conflict. Please investigate this matter thoroughly.

*Id.*

Merritt has stated that he looked into the concerns White raised with regard to Ryan, but found no evidence that anyone had behaved inappropriately toward White. Decl. of Terrill Merrit [DE-58-2] ¶ 35. Merritt still suggested to Keen that he hold a meeting with Ryan, Gardinier, and White to discuss these concerns and Ryan's communication style. *Id.* According to Merritt, Keen did so, and reported back after the meeting that the issue had been resolved. *Id.*

White also testified in his deposition in that in June 2013, he was looking for some parts in an aisle, and Ryan came by and said, "you look like a little black monkey . . . looking for a banana." Dep. of White [DE-58-1] at 23. White reported the comment to Keen, who told White that Ryan "shouldn't be saying that and I'm going to talk to him." *Id.* at 23-24. White did not report the comment to anyone else. *Id.* at 24.

Merritt, the Human Resources Manager, contends that prior to the July 11, 2013, meeting regarding White's demotion, White had never complained to him about race discrimination or racial harassment. Decl. of Terrill Merritt [DE-58-2] ¶ 36. He admits, however, that White did make an accusation of racism during the July 11, 2013, demotion meeting. *Id* ¶ 37. According to Merritt, however, at that time the decision to demote White already had been made, and his profane outburst during the meeting "had all but assured his termination as well." *Id.*

**D.    White's post-termination allegations of discrimination and harassment**

On July 15, 2012, White filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that he had been harassed and discriminated against

on the basis of his race (African American) and retaliated against for engaging in protected activity.

Specifically, he stated:

> I. Since early 2013, I was harassed while in the work environment by my team leader, Mr. Brent Ryan, Caucasian, who tried to intimidate me, refused to communicate with me and directed total disrespect toward me. In April 2013, I engaged in protected activity when I complained via electronic e-mail to a manager, Mr. Monsour [sic] Kadavanthode, Caucasian, and to the human resources manager, Mr. Terrill Merritt, Black, about the harassment directed toward me by Ryan because of my race, Black. Consequently, materials were purposefully moved and hid from me, belittling comments and gestures were directed toward me by Mr. Brian Keen, Mr. Brent Ryan, and Mr. Kirk Gardiner [sic], all Caucasians, and on July 11, 2013, Mr. Keen recommended that I be demoted from a logistics grief analyst position to a warehouse associate position. I have been employed by the above named employer since August 2012.
> II. No reason was given to me by team leader, Mr. Brent Ryan, Caucasian, for his intimidation, lack of communications or the total disrespect he directed toward me. No action was taken by the employer to resolve the complaints I submitted to Mr. Kadavanthode, and Mr. Merritt in April 2012 about the harassment directed toward me by Mr. Keen because of my race, Black.
> Unlike me, a similarly situated co-worker, Mr. Alan Thomas, Caucasian, was not harassed or intimidated while in the work environment.
> III. I believe that I was discriminated against because of my race, Black, and retaliation for complaining via electronic e-mail to Mr. Kadavanthode and Mr. Merritt, about the harassment directed toward me by Mr. Ryan because of my race, Black, in violation of the Title VII of the Civil Rights Act of 9164 [sic], as amended.

Dep. of White [DE-58-1], Ex. 7. After receiving a right to sue letter, White initiated the instant action.

## III. STANDARD OF REVIEW

At summary judgment, the court must examine the evidence presented by both parties and determine if there is a need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013). The court examines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail

as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Where the moving party shows that the evidence is so one-sided that it should prevail as a matter of law, the burden shifts to the nonmoving party to come forward with affidavits, depositions, answers to interrogatories, or other evidence demonstrating that there is a genuine issue of material fact that requires trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986); *Matsushita*, 475 U.S. at 587; *Pension Benefit Guar. Corp. v. Beverley*, 404 F.3d 243, 246-47 (4th Cir. 2005). An issue of fact is genuine if a reasonable jury could find for the nonmoving party. *Liberty Lobby*, 477 U.S. at 248. A fact is material if proof of the fact might affect the outcome of the case under the substantive law. *Id.* The facts should be viewed in the light most favorable to the nonmoving party and all reasonable inferences should be made in favor of the nonmoving party. *Id.* at 255; *Smith v. Va. Commonwealth Univ.*, 84 F.3d 672, 675 (4th Cir. 1996).

### IV. ANALYSIS

White asserts four claims in his Complaint and Amended Complaint: (1) unlawful failure to promote or hire; (2) unlawful termination of his employment; (3) unlawful retaliation; and (4) harassment, all based on his race and/or protected activity and in violation of Title VII. CLI has moved for summary judgment on all of White's claims. The court will examine each claim in turn.

A. **White's failure to hire or promote claim is barred for failure to exhaust administrative remedies**

Title VII makes it an "unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex . . . ." 42 U.S.C. § 2000e-2(a)(l). "Before a plaintiff may file suit under Title VII . . . he is required to

Case 5:13-cv-00684-F   Document 70   Filed 12/16/14   Page 9 of 20

file a charge of discrimination with the EEOC," thereby exhausting his administrative remedies. *Jones v. Calvert Group, Ltd.,* 551 F.3d 297, 300 (4th Cir. 2009) (citing 42 U.S.C. § 2000e-5(f)(l)). The exhaustion of administrative remedies is a statutory prerequisite to properly invoke the jurisdiction of the federal court. *Id.* ("[A] failure by the plaintiff to exhaust administrative remedies concerning a Title VII claim deprives the federal courts of subject matter jurisdiction over the claim."). To be timely, a charge of discrimination must be filed within 180 days after the alleged discrimination occurred. *See* 42 U.S.C. § 2000e-5(e)(1) and 29 U.S.C. § 626(d); *see also E.E.O.C. v. Commercial Office Prods. Co.,* 486 U.S. 107, 110 (1988).

The allegations contained in the EEOC charge "generally operate to limit the scope of any subsequent judicial complaint." *Evans v. Techs. Applications* & *Serv. Co.,* 80 F.3d 954,962-63 (4th Cir. 1996) (citation omitted). "If the claims raised under Title VII exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred." *Chacko v. Patuxent Inst.,* 429 F.3d 505, 509 (4th Cir. 2005) (quotation omitted). Consequently, the Fourth Circuit has held that "if the factual foundation in the administrative charge is too vague to support a claim that is later presented in subsequent litigation, that claim will also be procedurally barred." *Id.* (citation omitted).

Under these principles, White's claim alleging a discriminatory failure to promote or hire is barred for failure to exhaust administrative remedies.  The charge White filed with the EEOC fails to mention any facts concerning White applying and/or being rejected for any employment positions at his employer. *See* Dep. of White [DE-58-1], Ex. 7. The Fourth Circuit has made clear that "[a] claim will . . . typically also be barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another

10

type—such as discrimination in pay and benefits." *Chacko*, 429 F.3d at 509; *see also Lawson v. Burlington Indus., Inc.*, 683 F.2d 862, 863-64 (4th Cir. 1982) (barring claim of discriminatory failure to rehire because charge only alleged illegal layoff). Accordingly, CLI is entitled to judgment on White's claim for failure to promote or hire.

**B.     White has failed to proffer sufficient evidence to establish a prima facie case of discriminatory discharge**

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . race . . . ." 42 U.S.C. § 2000e-2(a)(1). Title VII plaintiffs may establish a claim for intentional discrimination via two avenues of proof: (1) the burden-shifting pretext method, as espoused in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), or (2) the mixed motive method. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.* 354 F.3d 277, 284-85 (4th Cir. 2004) (en banc).

Under the familiar *McDonnell Douglas* scheme, a plaintiff first must establish a *prima facie* case of discrimination. *See id.*, 411 U.S. at 802. To establish a *prima facie* case of race discrimination, a plaintiff must proffer evidence showing that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) there were circumstances giving rise to an inference of discrimination, and (4) at the time of the adverse employment action, he was meeting his employer's legitimate expectations. *See McDonnell Douglas*, 411 U.S. at 802.

If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to defendant to produce a legitimate, nondiscriminatory reason for the adverse employment action. *See Hill*, 354 F.3d at 285. If the defendant meets it burden of production by setting for a legitimate, nondiscriminatory reason for the action, the plaintiff then bears the burden of showing, by a

11

preponderance of the evidence, that the defendant's proffered neutral reasons were not its true reasons, but were instead a pretext for discrimination or retaliation. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). "[T]he burden to demonstrate pretext has merged with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) (quotation omitted).

In this case White has failed to come forward with evidence showing that his demotion and eventual termination involved circumstances giving rise to an inference of race discrimination. Ordinarily, to establish a *prima facie* case of discriminatory discharge, a plaintiff must show that his position ultimately was filled by someone outside the protected class. *Miles v. Dell, Inc.*, 429 F.3d 480, 486 (4th Cir. 2005) ("It is thus clear that the law in this circuit is that, as a general rule, Title VII plaintiffs must show that they were replaced by someone outside their protected class in order to make out a prima facie case."). The reason for this rule is because when "someone within [the] protected class is hired as a replacement, that fact ordinarily gives rise to an inference that the defendant did not fire the plaintiff because of [the] protected status." *Id.* at 488. Here, the record shows that the individual selected to fill White's position as the second shift Grief Analyst also was African American. *See* Decl. of Terrill Merritt [DE-58-2] ¶ 38. Moreover, White has not come forward with any evidence tending to negate this inference of non-discrimination. *See Miles*, 429 F.3d at 487-89 (recognizing that there may exceptions to the fourth prong of the *prima facie* case, including where "a significant lapse of time occurs between the adverse employment aciton and the decision to hire another a person" and where "the firing and replacement hiring decisions are made by different decisionmakers").

12

To the extent that White contends that CLI's decision to demote him and terminate his employment constitutes discriminatory discipline, he also fails to establish a *prima facie* case. "In the employee discipline context, a prima facie case of discrimination is established if the plaintiff shows that he 'engaged in prohibited conduct similar to that of a person [outside the protected class] . . . and . . . that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person." *Kelley v. United Parcel Service, Inc.*, 528 F. App'x 285, 286 (4th Cir. 2013) (quoting *Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir. 1985)). White suggested in his EEOC Charge that Alan Thomas, a Caucasian co-worker, was treated more favorably than him. *See* Dep. of White [DE-58-1], Ex. 7. The record is bereft of evidence, however, that Thomas had any of the same perceived performance deficiencies as White or that he had an angry outburst directed at management. Without such evidence, White cannot show Thomas engaged behavior similar to that which led to White's demotion and termination.

As the foregoing shows, White has failed to proffer sufficient evidence to establish a *prima facie* case of race discrimination. Accordingly, CLI is entitled to summary judgment on his discriminatory discharge claim.

**C.      White has failed to proffer sufficient evidence to show pretext to support his retaliation claim**

CLI also moves for summary judgment on White's Title VII retaliation claim. Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). A plaintiff may establish a Title VII retaliation claim under the burden-shifting framework set forth in *McDonnell Douglas*. First, a plaintiff bears the burden of establishing a prima facie case of retaliation, whereupon the burden shifts to the employer to establish a legitimate, non-retaliatory reason for the adverse action. If the employer sets forth a legitimate, non-retaliatory reason for the action, the plaintiff then bears the burden of showing the employer's proffered reasons are pretextual or his claim will fail. *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004).

To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a protected activity; (2) her employer took an adverse action against her; and (3) a causal connection exists between the protected activity and the asserted adverse action. *King v. Rumsfeld*, 328 F.3d 145, 151-52 (2003). For many years, courts in the Fourth Circuit adhered to the view that a close temporal proximity between the protected activity and the adverse action is sufficient to establish the causal connection of the *prima facie* case. *See, e.g., Williams v. Cerebronics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989). The United States Supreme Court has recently held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . requir[ing] proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, ___ U.S.___, 133 S.Ct. 2517, 2533 (2013). Some courts have interpreted the *Nassar* decision as imposing a heightened causation requirement at the *prima facie* stage. *See, Askins v. Belissary*, Civil Action No. 4:12-cv-1856-RBH, 2014 WL 507279, at * (D.S.C. Feb. 6, 2014) ("Several courts from within the Fourth Circuit appear to be in agreement that Nassar requires that a plaintiff must establish the third element of her *prima facie* case, the causation element, pursuant to the but-for standard.") (collecting cases).

14

Other courts, however, have rejected the idea that *Nassar* impacts the analysis as to whether a plaintiff has established a *prima facie* case. *See, e.g., Taylor v. Peninsula Regional Med. Ctr.*, 3 F. Supp. 3d 462, 472 (D. Md. 2014) ("The Court does not believe that *Nassar* significantly impacts where a plaintiff asserts a causal connection based on close temporal proximity between the protected conduct and the adverse employment action."). The Fourth Circuit has yet to directly address the issue.

Assuming that pre-*Nassar* law regarding temporal proximity remains good law, the court could conclude that White has satisfied the light burden of establishing a *prima facie* case. The record shows that in June 2013, he complained to Keen about Ryan's racially offensive remark–which constitutes protected activity–and a month later he was terminated. *See Price*, 380 F.2d at 213. Nevertheless, the court need not determine whether *Nassar* impacts the burden of establishing a *prima facie* case, because regardless of whether White has established a *prima facie* case, the record shows that CLI has articulated a legitimate, non-discriminatory reason for White's discharge that White has not shown is pretext.

Specifically, CLI has stated that White was demoted "because of a series of performance problems and his failure to correct those problems despite numerous attempts to coach and counsel him, and . . . it terminated his employment because of his angry and profane outburst in the demotion meeting." Mem. in Support of Mot. for Summ. J. [DE-58] at 14. The burden now shifts to White to adduce sufficient evidence that, if believed, would allow the finding that CLI's purported reason for his demotion and subsequent termination was a pretext, and retaliation was in fact the "but for" causation of his termination. White has not met this burden.

15

Broadly construing White's opposition to the motion for summary judgment, it appears that he makes two arguments as to why he has shown that CIL's reason for his termination was pretext for retaliation. First, he appears to take issue with being put on an EIP at all. Second, he contends that CLI failed to follow its own policy with regard to investigating his complaints of discrimination.

With regard to White's first argument, his disagreement with being put an EIP does not constitute sufficient evidence to establish pretext. First, his placement on the EIP preceded any of his alleged protected activity. White was placed on the EIP on April 11, 2013; he made his complaint about Ryan's offensive remark in June 2013.[2] It, therefore, is not evidence of pretext that would show that retaliation was the true reason for his demotion and subsequent termination. Additionally, Keen reprimanded White for his use of his personal smartphone during work hours in the Facility Manager's office, something explicitly prohibited by the EIP, prior to White's first complaint about racism. Moreover, the fact that White disagrees with Keen's assessment of his performance subsequent to the issuance of the EIP is irrelevant, absent evidence showing that Keen truly did not believe White was not performing up to par. *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff."); *Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 444 (4th Cir. 1998) (affirming grant of summary judgment because the plaintiff "offer[ed] no evidence that the events recounted in [the decisionmaker's affidavit] are untrue or that retaliation was the true reason for her firing"),

---

[2] Even if the court considers White's email to Merritt complaining about intimidation and harassment to constitute protected activity—even though it did not reference race or another protected trait under Title VII–this email also was sent after the EIP was imposed. The same analysis applies to White's alleged statements to Keen in May 2013 that "y'all are all racists around here."

*overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002).

Without such evidence, White has not established pretext.

Nor does White's contention that CLI failed to investigate his complaints, allegedly in violation of its internal policies, suffice to show that retaliation was the but-for causation of his termination. This assertion does nothing to counter the stated reasons for his demotion and termination. Indeed, his opposition to the motion for summary judgment appears to concede the fact that he reacted angrily in the July 11, 2013 meeting about his demotion—which was the stated reason for his termination. Pl.'s Mem. in Opp. to Mot. for Summ. J. [DE-64] at 5-6 ("CLI upper management let the conspiracy go on letting the harassment, intimidation and bulling [sic] continue, which was [sic] lead to a [sic] angry display built up in the Plaintiff from the frustration of resentment and hopelessness through the months of complaining to management about their behavior and acts."). Put simply, White has not proffered sufficient evidence from which the finder of fact could conclude that retaliation was "but for" cause of his termination. As such, CLI is entitled to judgment on his retaliation claim.

**D.     White has proffered insufficient evidence to show he was subjected to a hostile work environment on the basis of his race**

As the court already has observed, Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . race . . . ." 42 U.S.C. § 2000e-2(a)(1). "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *EEOC v. R & R Ventures,* 244 F.3d 334, 338 (4th Cir. 2001).

To survive a motion for summary judgment on a hostile work environment claim, a plaintiff must show that the evidence, viewed in his favor,

> would allow a reasonable jury to conclude that the harassment was (1) unwelcome (2) based on [a plaintiff's] . . . race, (3) sufficiently severe or pervasive to alter the conditions of h[is] employment and create an abusive atmosphere, and (4) imputable to [his employer.].

*EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). White has not done this, and accordingly, CLI is entitled to summary judgment on his hostile work environment claim.

As CLI recounts in its memorandum in support of its motion for summary judgment, White asserts that the following conduct supports his hostile work environment claim:

> Ryan and Keen following him around the facility, including into the bathroom to check on his whereabouts and to see if he was on his phone; Ryan would often tell people White was incompetent and stupid; Ryan told White on one occasion that he looked like a "little black monkey"; Gardiner withheld information from White and excluded him from meetings; Gardiner would ignore White when he asked questions; Gardiner would move material and put it in the wrong location; Keen did not instruct the team leads to stop doing what he was complaining about; Keen told White that if he did not like working at the facility he should just leave.

Mem. in Support of Mot. for Summ. J. [DE-58] at 24 (citing Dep. of White [DE-58-1] at 17, 29, 32-33, 36-37, 47-48, Ex. 7). This is insufficient to establish either that the conduct was based on White's race, or that it was sufficiently severe or pervasive such as to alter the conditions of his employment.

To meet the "severe or pervasive" element, a plaintiff's workplace must be "permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working atmosphere." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993) (internal citations and quotations omitted). "Relevant considerations 'may include the frequency of the discriminatory conduct, its severity; whether it is

18

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001) (quoting *Harris*, 410 U.S. at 23). Courts have found complaints based on merely rude treatment, *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006), "callous behavior by [one's] superiors," *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), and superiors," or "a routine difference of opinion and personality conflict with [one's] superior" to be insufficient to establish harassment. Here, most of White's allegations concerning his co-worker's and supervisor's conduct amount to nothing more than the routine disagreements and conflict found in numerous workplaces, and are not actionable under Title VII.

Nor does the bulk of the White's allegations concern race. White does reference the indisputably offensive and race-based comment by his co-worker, Ryan, comparing White to a "little black monkey." However, "[a] single, isolated remark by a non decision-maker does not constitute 'severe' or 'pervasive' harassment, as those terms have been interpreted by the courts." *Bennett v. City of Greensboro*, No. 1:02CV00366, 2002 WL 32086528, at *1 (M.D.N.C. Nov. 7, 2002) (memorandum and recommendation) *adopted by* 2002 Wl 32087733 (Dec. 13, 2002). Accordingly, the court finds that White has failed to proffer sufficient evidence that he was subjected to severe or pervasive harassment that was based on his race.

## V. CONCLUSION

For the foregoing reasons, CLI's Motion for Summary Judgment [DE-57] is ALLOWED, and Plaintiffs' claims are DISMISSED. The Clerk of Court is DIRECTED to close this case.

SO ORDERED.

This the _16_ day of December, 2014.

19

_James C. Fox_
JAMES C. FOX
Senior United States District Judge